## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.*<br>JOSIAH CHUMBA,<br><br>     Relator,<br><br>and<br><br>JOSIAH CHUMBA,<br><br>     Plaintiff,<br><br>v.<br><br>EMCOMPASS HEALTH CORPORATION,<br>d/b/a MidAmerica Rehabilitation Hospital,<br><br>and<br><br>TIFFANY KIEHL,<br><br>     Defendants. | Case No. 20-2513-DDC-RES |

## MEMORANDUM AND ORDER

Relator Josiah Chumba brings this *qui tam* action on behalf of the United States

government. He alleges violations of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729–3733,

against defendants Encompass Health Corporation, d/b/a MidAmerica Regional Hospital

("MidAmerica") and Tiffany Kiehl. Relator asserts that defendants knowingly submitted false or

fraudulent Medicare claims to the United States government and the government paid those false

claims. Relator also asserts a FCA claim for unlawful retaliation, alleging that defendant

MidAmerica terminated his employment because he opposed fraud that reasonably could lead to

a FCA action. And relator alleges a race discrimination claim under 42 U.S.C. § 1981 because—

he contends—defendants terminated his employment based on his race.

This matter comes before the court on defendants' Motion to Dismiss Relator's Second Amended Complaint (Doc. 42). Relator has filed an Opposition, and in the alternative, a Motion for Leave to File a Third Amended Complaint (Doc. 53). Defendants have submitted a Reply and Opposition to relator's Motion for Leave to File Third Amended Complaint (Doc. 54). And relator has filed a Reply supporting his Motion for Leave (Doc. 55). The two pending motions thus are fully briefed for the court's decision. For the reasons explained below, the court grants defendants' Motion to Dismiss (Doc. 42). And the court denies relator's Motion for Leave to File a Third Amended Complaint (Doc. 53).

## I.      Factual Background

The following facts come from relator's Second Amended Complaint (Doc. 34). The court accepts the facts as true and views them in the light most favorable relator, as the party opposing the Motion to Dismiss. *Doe v. Sch. Dist. No. 1*, 970 F.3d 1300, 1304 (10th Cir. 2020) (explaining that on a motion to dismiss the court "accept[s] as true all well-pleaded factual allegations in the complaint and view[s] them in the light most favorable to" the party opposing the motion (citation and internal quotation marks omitted)).

### *Relator's Employment with Defendant MidAmerica*

In January 2019, relator began working as a nurse for defendant MidAmerica. Doc. 34 at 7 (Second Am. Compl. ¶ 36). Defendant MidAmerica is an inpatient rehabilitation facility ("IRF") that provides inpatient rehabilitation to patients suffering from stroke, brain, and spinal cord injuries and other complex neurological and orthopedic conditions. *Id.* at 3 (Second Am. Compl. ¶¶ 11–12). At all times relevant to this lawsuit, defendant Tiffany Kiehl served as Chief Executive Officer for defendant MidAmerica's IRF located in Overland Park, Kansas. *Id.* (Second Am. Compl. ¶ 13).

2

When relator began his employment with defendant MidAmerica, he worked as a "PRN" nurse, meaning he worked on an as-needed basis. *Id.* at 7 (Second Am. Compl. ¶ 37). As a PRN nurse, relator was required to work a certain number of shifts during a set period of time. *Id.* (Second Am. Compl. ¶ 38). During his employment, the "primary way" defendant MidAmerica placed its PRNs nurses on particular shifts was by telephone, email, or text messages with defendant MidAmerica's scheduler. *Id.* (Second Am. Compl. ¶ 39). Defendant MidAmerica's scheduler would send text messages to PRN nurses, asking if they were available for various shifts. *Id.* (Second Am. Compl. ¶ 40). Alternatively, PRN nurses (like relator) could call or send text messages to the scheduler asking what shifts were available for them to work. *Id.* (Second Am. Compl. ¶ 41).

### Defendant MidAmerica's Admission of Patients

During relator's employment with defendant MidAmerica, one of the job duties for nurses included evaluating patients' Functional Independence Measurement ("FIM") scores over the course of the patients' admission. *Id.* at 6–7 (Second Am. Compl. ¶¶ 31, 42). Several times, relator "was encouraged" to assign FIM scores to patients that did not accurately reflect the patient's condition. *Id.* at 7 (Second Am. Compl. ¶ 43). No one ever instructed relator to falsify a particular patient's FIM score. *Id.* (Second Am. Compl. ¶ 44). Instead, relator's supervisor (the Chief Nursing Officer) and his colleagues "regularly reminded" him that he and the other nurses "needed to 'watch those FIM scores.'" *Id.*

Relator understood that the instruction to adjust patients' FIM scores inaccurately came from defendant MidAmerica's management, including defendant Kiehl. *Id.* at 8 (Second Am. Compl. ¶ 45). Relator observed a number of patients whose FIM scores at admission didn't reflect the patients' conditions accurately. *Id.* (Second Am. Compl. ¶ 46). Relator observed "a

number of patients" for whom—relator believed—intensive rehabilitation therapy wasn't appropriate, either because the patient didn't need it or because it wasn't reasonable to expect the patient to benefit from it. *Id.* (Second Am. Compl. ¶ 47). Also, the nursing staff regularly discussed among themselves that defendant MidAmerica was admitting patients for whom intensive rehabilitation therapy was not appropriate. *Id.* (Second Am. Compl. ¶ 48).

As one example, around September 5, 2019, relator cared for a patient who he identifies as "W.F." *Id.* (Second Am. Compl. ¶ 49). W.F. was too unstable for rehabilitation. *Id.* (Second Am. Compl. ¶ 50). So, according to relator, inpatient therapy otherwise reimbursable by Medicare was not appropriate for W.F. *Id.* Relator alleges, upon information and belief, that a doctor from Truman Hospital contacted defendant MidAmerica with concerns that defendant MidAmerica had discharged W.F. to rehabilitation prematurely. *Id.* (Second Am. Compl. ¶ 51). Relator sent W.F. back to the hospital because of his unstable condition. *Id.* (Second Am. Compl. ¶ 52). Relator filed an incident report with defendant MidAmerica about W.F.'s inappropriate admission. *Id.* (Second Am. Compl. ¶ 53).

As another example, relator cared for a male patient ("Patient in Room 256") around July 6, 2019. *Id.* (Second Am. Compl. ¶ 54). Patient in Room 256 was violent and confused, and he wasn't able to participate in or understand his rehabilitation goals. *Id.* (Second Am. Compl. ¶ 55). At one point, it took about five or six members of the nursing staff to hold Patient in Room 256 down to prevent him from harming himself. *Id.* at 9 (Second Am. Compl. ¶ 56). Relator heard a doctor express confusion about Patient in Room 256's admission for rehabilitation therapy. *Id.* (Second Am. Compl. ¶ 57). According to relator, inpatient therapy otherwise reimbursable by Medicare was not appropriate for Patient in Room 256. *Id.* (Second Am. Compl. ¶ 58).

As a care provider for defendant MidAmerica's patients, relator had access to information about patients' payment methods. *Id.* (Second Am. Compl. ¶ 59). When relator entered a patient's room to provide care and opened the patient's electronic medical record, one of the pieces of information provided on the first screen of the patient's records showed the patient's primary—and, if applicable, secondary—form(s) of payment. *Id.* (Second Am. Compl. ¶ 60). Relator doesn't recall treating a single patient at defendant MidAmerica who had anything other than Medicare listed as the patient's primary payor. *Id.* (Second Am. Compl. ¶ 61). Relator recalls that both W.F. and Patient in Room 256 were Medicare recipients. *Id.* (Second Am. Compl. ¶ 62). And, relator alleges, it's reasonable to presume that defendant MidAmerica ultimately submitted claims to Medicare for the treatment of both patients. *Id.* (Second Am. Compl. ¶ 63).

### *Defendant MidAmerica's Staffing*

Relator regularly worked on shifts that defendant MidAmerica inadequately staffed for the needs of patients. *Id.* (Second Am. Compl. ¶ 64). According to defendant Kiehl, defendant MidAmerica's policy maintains a staffing ratio of eight to 10 patients per registered nurse. *Id.* (Second Am. Compl. ¶ 65). According to relator, defendant MidAmerica's staffing policy nearly doubles the recommended patient-to-nurse ratio. *Id.* at 10 (Second Am. Compl. ¶ 66). During his employment with defendant MidAmerica, relator worked on several shifts that exceeded even defendant MidAmerica's target—and insufficient—patient-to-nurse ratio. *Id.* (Second Am. Compl. ¶ 67).

For example, around April 6, 2019, relator worked a shift that had just one nurse for every 10 to 12 patients or so. *Id.* (Second Am. Compl. ¶ 68). Similar patient to nurse ratios

existed around June 3, 2019, June 9, 2019, June 17, 2019, August 13, 2019, and September 4, 2019.  *Id.* (Second Am. Compl. ¶ 69).

Relator told defendant MidAmerica that he was not going to sign up for shifts during the week of July 12, 2019, because the anticipated ratio of patients to nurses was dangerous.  *Id.* (Second Am. Compl. ¶ 70).  Based on relator's education, training, and experience, relator believes that operating at such an extreme patient-to-nurse ratio produces grossly substandard care for the patients, producing care that is significantly lower in value than that anticipated by Medicare.  *Id.* (Second Am. Compl. ¶ 71).  Also, operating at such an extreme patient-to-nurse ratio puts both patient and nurse at significant risk of injury.  *Id.* (Second Am. Compl. ¶ 72).  Relator calls defendant Kiehl's stated staffing level goal "grossly misaligned with recognized appropriate levels" such "that it evidences a scheme on the part of [d]efendants to obtain Medicare reimbursement by reducing the value of services provided to Medicare beneficiaries."  *Id.* at 11 (Second Am. Compl. ¶ 81).

Relator regularly witnessed substandard care for his patients caused by defendant MidAmerica's understaffing policies.  *Id.* at 10 (Second Am. Compl. ¶ 73).  For example, around June 9, 2019, relator cared for a patient identified here as "P.B."  *Id.* (Second Am. Compl. ¶ 74).  When reviewing P.B.'s record, relator noted that staff never completed a number of "crucial services" scheduled for the previous shift.  *Id.* (Second Am. Compl. ¶ 75).  As another example, relator cared for another patient identified here as "D.M.", around April 7, 2019.  *Id.* (Second Am. Compl. ¶ 76).  When reviewing D.M.'s record, relator noted that staff hadn't completed a number of "crucial services" scheduled for the previous shift.  *Id.* at 11 (Second Am. Compl. ¶ 77).

Relator also cared for another patient identified here as "J.W.", on August 14, 2019.  *Id.* (Second Am. Compl. ¶ 78).  J.W.'s records reflected that a number of crucial services were scheduled for the previous shift but staff had not completed them.  *Id.*  When reviewing W.F.'s record on September 5, 2019, relator again noted that a number of crucial services were scheduled for the previous shift but staff had not completed them.  *Id.* (Second Am. Compl. ¶ 79).

During the shifts he worked, relator observed that most—if not all—patients' electronic medical records reflected Medicare as the primary and only source of payment.  *Id.* (Second Am. Compl. ¶ 80).  Relator recalls that P.B., D.M., and J.W. were Medicare recipients.  *Id.* (Second Am. Compl. ¶ 82).  And, relator alleges, it's reasonable to presume that defendant MidAmerica ultimately submitted claims to Medicare for the treatment of these patients.  *Id.* (Second Am. Compl. ¶ 83).

### *Relator Complains about Staffing Levels*

On April 9, 2019, relator sent an email to defendant Kiehl informing her that he believed defendant MidAmerica was placing its patients and nurses at significant risk of injury because of its staffing levels.  *Id.* (Second Am. Compl. ¶ 84).  Relator sent another email with his concerns about staffing levels to defendant Kiehl on July 12, 2019, and then again on August 13, 2019. *Id.* at 12 (Second Am. Compl. ¶ 85).

On October 14, 2019, relator received an email informing him defendant MidAmerica had terminated his employment.  *Id.* (Second Am. Compl. ¶ 86).  Relator alleges that the reasons defendant MidAmerica provided for his termination were pretextual because defendant MidAmerica didn't terminate other employees who never reported repeated concerns about staffing levels for the same or similar conduct.  *Id.* (Second Am. Compl. ¶ 87).

### *Relator's Race*

Relator is Black.  *Id.* at 17 (Second Am. Compl. ¶ 119).[1]  Relator alleges that the reasons defendant MidAmerica provided for his termination were pretextual because defendant MidAmerica didn't terminate other white employees for the same or similar conduct.  *Id.* at 12 (Second Am. Compl. ¶ 88).

## II.   Legal Standard

Defendants seek dismissal under Federal Rules of Civil Procedure 8(a), 9(b), and 12(b)(6).  Doc. 42 at 1.  The court provides the governing legal standard for each Federal Rule of Civil Procedure, below.

### A.  Rule 8

Rule 8 prescribes "general rules of pleading."  Fed. R. Civ. P. 8.  Section (a)(2) provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]"  Fed. R. Civ. P. 8(a)(2).  Although this Rule "does not require 'detailed factual allegations,'" it calls for more than a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of the cause of action'" which, as the Supreme Court explained, "'will not do.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

### B.  Rule 12(b)(6)

Fed. R. Civ. P. 12(b)(6) allows a party to move the court to dismiss an action for failing "to state a claim upon which relief can be granted[.]"  Fed. R. Civ. P. 12(b)(6).  For a complaint to survive a Rule 12(b)(6) motion to dismiss, the pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S.

---

[1]      Relator identifies himself as Black.  *See* Doc. 34 at 17 (Second Am. Compl. ¶ 119).  The court thus adopts his terminology, describing his racial identity as Black.

at 678 (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  When considering a Rule 12(b)(6) motion to dismiss, the court must assume that the factual allegations in the complaint are true, but it is "'not bound to accept as true a legal conclusion couched as a factual allegation.'"  *Id.* (quoting *Twombly*, 550 U.S. at 555).

### C.  Rule 9

Fed. R. Civ. P. 9 governs "pleading special matters" in cases like this one, alleging fraud. Fed. R. Civ. P. 9.  For fraud allegations, "a party must state with *particularity* the circumstances constituting the fraud[.]"  Fed. R. Civ. P. 9(b) (emphasis added).  In other words, Rule 9(b) demands a "heightened pleading standard[.]"  *Welch v. Centex Home Equity, Co.*, 323 F. Supp. 2d 1087, 1094 (D. Kan. 2004) (citations omitted).

One must read the particularity requirement contained in Rule 9(b) "in conjunction with the principles of Rule 8, which calls for pleadings to be 'simple, concise, and direct[.]'"  *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1252 (10th Cir. 1997) (quoting Fed. R. Civ. P. 8).  Rule 9(b) thus "joins with [Rule] 8(a) to form the general pleading requirements for claims under the FCA."  *U.S. ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1171 (10th Cir. 2010) (citations omitted).  Our Circuit has explained that "Rule 9(b) supplements [Rule] 8(a) in setting forth the pleading requirements under the FCA."  *Id.*  And, as our Circuit also has explained, the Supreme Court's seminal rulings in *Twombly* and *Iqbal* didn't alter Rule 9's primary focus "'to afford defendant fair notice of plaintiff's claims and the factual ground upon which [they] are based[.]'"  *Id.* at 1172 (quoting *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1236 (10th Cir. 2000)).  As a consequence, "claims under the FCA need only show the specifics

of a fraudulent scheme and provide an adequate basis for a reasonable inference that false claims were submitted as part of that scheme." *Id.* (first citing *U.S. ex rel. Duxbury v. Ortho Biotech Prods.*, 579 F.3d 13, 29 (1st Cir. 2009); then citing *U.S. ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 854–55 (7th Cir. 2009); and then citing *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009)).

## III.    Analysis

Relator, then proceeding pro se, filed his original Complaint in October 2020.  Doc. 1. Still proceeding pro se, he filed a First Amended Complaint as a matter of right in January 2021. Doc. 9.  After counsel entered an appearance on relator's behalf in January 2022 (Doc. 24), relator's counsel filed a Motion for Leave to Amend the Complaint (Doc. 31).  The court granted that motion in part, and relator filed his Second Amended Complaint in July 2022.  Doc. 34.

Relator's Second Amended Complaint asserts four claims:  (1) a FCA claim for submitting false or fraudulent claims for payment violating 31 U.S.C. § 3729(a)(1)(A) (Count I); (2) a FCA claim for making false records or statements material to a false or fraudulent claim violating 31 U.S.C. § 3729(a)(1)(B) (Count II); (3) a FCA retaliation claim under 31 U.S.C. § 3730(h)(1) (Count III); and (4) a race discrimination claim violating 42 U.S.C. § 1981 (Count IV).  Defendants move to dismiss all four of relator's claims under Rule 12(b)(6), arguing that relator fails to state a plausible claim for relief.[2]  The court addresses each claim, in turn, below.

---

[2]    Defendants also argue that relator named the wrong defendant.  Doc. 43 at 17.  Relator has named Encompass Health Corporation d/b/a MidAmerica Rehabilitation Hospital as a defendant.  *Id.*  But, defendants assert, Encompass doesn't do business as MidAmerica Rehabilitation Hospital.  *Id.*  Instead, defendants explain, MidAmerica Rehabilitation Hospital is owned by K.C. Rehabilitation Hospital, Inc. *Id.*

Relator responds that the incorrect naming of a defendant is a "technical" deficiency and one he can cure by amendment.  Doc. 53 at 10.  That's true.  The court could permit relator to cure this deficiency by filing an amended complaint.  However, the court declines to permit amendment here because—as it explains in more detail below—relator hasn't shown that leave to amend is warranted

### A.  FCA Claims (Counts I & II)

Relator's first two claims in Counts I and II assert *qui tam* actions under the FCA on behalf of the U.S. government.  The phrase "*qui tam*" "is an abbreviation for *qui tam pro domino rege quam pro se ipso in hac parte sequitur*, which means 'who as well for the king as for himself sues in this matter.'"  *Grubbs*, 565 F.3d at 184 n.5 (quoting Black's Law Dictionary 1262 (7th ed. 1999)).  *Qui tam* suits are "brought by private persons on behalf of the Government" when permitted by statute.  *Id.* at 184.

Relevant here, the FCA permits "a private party known as a 'relator' to bring an FCA action on behalf of the Government."  *State Farm Fire & Cas. Co. v. U.S. ex rel. Rigsby*, 580 U.S. 26, 29 (2016) (citing 31 U.S.C. § 3730(b)(1) (further citations omitted)).  The FCA confers authority on the Attorney General "to intervene in a relator's ongoing action or to bring an FCA suit in the first instance."  *Id.* (citing 31 U.S.C. § 3730(a)–(b)).  But when the government declines to intervene—as it did in this lawsuit— "the relator 'shall have the right to conduct the action.'"[3]  *U.S. ex rel. Polukoff v. St. Mark's Hosp.*, 895 F.3d 730, 735 (10th Cir. 2018) (quoting 31 U.S.C. § 3730(c)(3)).  "Depending on the specific circumstances of the *qui tam* suit, the government and the relator divide any proceeds derived from the suit."  *Id.* (citing 31 U.S.C. § 3730(d)).  "This system is designed to benefit both the relator and the Government."  *Rigsby*, 580

---

when he fails to allege facts in his current pleading or provide facts to include in a proposed amended pleading that are capable of supporting plausible finding or inference that defendant MidAmerica violated the FCA or § 1981.

[3]      The court doesn't attribute any significance to the government's decision not to intervene in a FCA lawsuit.  "As other courts have noted, the government 'may have a host of reasons for not pursuing a claim.'"  *U.S. ex rel. El-Amin v. George Washington Univ.*, 533 F. Supp. 2d 12, 21 (D.D.C. 2008) (quoting *U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1360 n.17 (11th Cir. 2006)).  Thus, the court doesn't "'assume that in each instance in which the government declines intervention in an FCA case, it does so because it considers the evidence of wrong doing insufficient[.]'"  *Id.* (quoting *Atkins*, 470 F.3d at 1360 n.17).  The FCA's text "clearly anticipates that . . . the Government will not necessarily pursue all meritorious claims" because a contrary view would obviate the law's purpose in having a *qui tam* provision at all.  *Id.* (citation and internal quotation marks omitted).

U.S. at 29; *see also id.* ("A relator who initiates a meritorious *qui tam* suit receives a percentage of the ultimate damages award, plus attorney's fees and costs." (citing 31 U.S.C. § 3730(d))).

The FCA is a remedial statute. *See Grubbs*, 565 F.3d at 189 ("Put plainly, the statute is remedial[.]").  The FCA was "first passed at the behest of President Lincoln in 1863 to stem widespread fraud by private Union Army suppliers in Civil War defense contracts." *Id.* at 184. Thus, to "aid the rooting out of fraud, the Act provides for civil suits brought by both the Attorney General and by private persons, termed relators, who serve as a 'posse of *ad hoc* deputies to uncover and prosecute frauds against the government.'" *Id.* at 184 (quoting *U.S. ex rel. Milam v. Univ. of Tex. M.D. Anderson Cancer Ctr.*, 961 F.2d 46, 49 (4th Cir. 1992)). "Congress has repeatedly amended the Act, but its focus remains on those who present or directly induce the submission of false or fraudulent claims." *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 579 U.S. 176, 182 (2016) (citation omitted).

Here, relator bases his FCA claims on two types of false or fraudulent claims that defendants allegedly made to the U.S. government. *First*, relator alleges that defendants knowingly submitted false or fraudulent claims to Medicare for services that weren't medically necessary and didn't reflect accurately the patients' condition.  Doc. 34 at 7–9 (Second Am. Compl. ¶¶ 42–63) (alleging "Submission of Claims for Therapy that Was Not Medically Necessary"); *see also id.* at 12, 14 (Second Am. Compl. ¶¶ 90, 99) (alleging violations of 31 U.S.C. § 3729(a)(1)(A) & (a)(1)(B) based on allegedly false or fraudulent Patient Assessment Instrument forms that "did not accurately reflect the condition of the patient to Medicare"). *Second*, relator alleges defendants knowingly submitted false or fraudulent claims for services that didn't qualify as adequate treatment because defendants hadn't staffed the facility with an appropriate number of nurses.  *Id.* at 9–11 (Second Am. Compl. ¶¶ 64–83) (alleging "Submission

of Claims for Inadequate Services"); *see also id.* at 12 (Second Am. Compl. ¶ 91) (alleging

violation of 31 U.S.C. § 3729(a)(1)(A) based on "claims to Medicare for patients who were

treated during period in which [d]efendant MidAmerica was grossly understaffed").

Defendants assert that relator fails to allege plausible FCA violations based on either one

of the two sets of alleged false for fraudulent conduct.  The court addresses defendants'

arguments, below.  But first, the court recites the legal requirements for pleading a plausible

FCA claim.

### 1.  Legal Standard Governing FCA Claims

The FCA "generally prohibits private parties from 'knowingly' submitting 'a false or

fraudulent claim' for reimbursement."  *Polukoff*, 895 F.3d at 741 (quoting 31 U.S.C. §

3729(a)(1)(A)).  The FCA imposes civil liability on "any person who . . . knowingly presents, or

causes to be presented, a false or fraudulent claim for payment or approval" to the United States

government.  31 U.S.C. § 3729(a)(1)(A).  "A 'claim' now includes direct requests to the

Government for payment as well as reimbursement requests made to the recipients of federal

funds under federal benefits programs."  *Escobar*, 579 U.S. at 182 (citing 31 U.S.C. §

3729(b)(2)(A)).

To allege a plausible FCA claim under § 3729, a plaintiff must plead facts capable of

establishing three elements:  "(1) a false statement or fraudulent course of conduct; (2) made

with the requisite scienter; (3) *that is material*; and (4) that results in a claim to the Government

or conceals, decreases, or avoids an obligation to pay the Government."  *U.S. ex rel. Janssen v.

Lawrence Mem'l Hosp.*, 949 F.3d 533, 539 (10th Cir. 2020) (citing *Polukoff*, 895 F.3d at 734).

For the third element, "FCA liability attaches only where the alleged misrepresentations

are *material* to the Government's payment decision."  *Id.* at 540 (emphasis added) (citing

*Escobar*, 579 U.S. at 191); *see also id.* ("Simply put, the FCA is not an 'all-purpose antifraud statute or a vehicle for punishing garden-variety breaches of contract or regulatory violations.'" (quoting *Escobar*, 579 U.S. at 194) (further citations omitted)).  "In the FCA context, materiality is a 'rigorous' and 'demanding' requirement."  *Id.* (quoting *Escobar*, 579 U.S. at 192–94 (further citations omitted)).  When assessing the materiality element, courts must analyze "the 'effect on the likely or actual behavior of the recipient of the alleged misrepresentation.'"  *Id.* (quoting *Escobar*, 579 U.S. at 193 (further citations omitted)): *see also* 31 U.S.C. § 3729(b)(4) (defining materiality as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property").  "Thus, the sine qua non of materiality is some quotient of potential influence on the decisionmaker[.]"  *Id.*

### 2. Relator's FCA Claims Based on Submitting Claims to Medicare for Therapy that Wasn't Medically Necessary

Defendants assert that relator has failed to allege a plausible FCA claim based on defendants' alleged submission of Medicare claims for services that weren't medically necessary.  Specifically, defendants argue, relator's FCA claims lack facial plausibility, fail to state a claim with particularity as Rule 9(b) requires, and never allege facts sufficient to satisfy the materiality requirement.

All parties agree that the Code of Federal Regulations provides the requirements that an IRF must follow when submitting claims for reimbursement from Medicare.  *See* Doc. 34 at 4–6 (Second Am. Compl. ¶¶ 23–24, 26–29) (citing various regulations codified within 42 C.F.R. ch. IV, subch. B, pt. 412, subpt. P); *see also* Doc. 54 at 9–11 (Defs.' Reply) (same).[4]  IRFs receive

---

[4]      Although relator's Second Amended Complaint cites the Code of Federal Regulations, relator also accuses defendants of relying on "extraneous material" because defendants' briefs refer to various guidance issued by the Centers for Medicare & Medicaid Services ("CMS") governing IRF's reimbursement practices.  Doc. 53 at 11–12 n.4.  Relator argues the court must ignore this material on a

payment for their services under "the prospective payment system," which pays IRFs "a predetermined amount per discharge" for services furnished to Medicare beneficiaries "based on the Federal payment rate[.]"  42 C.F.R. § 412.622(a)(1)–(2).  Subject to certain exceptions, "a reasonable expectation" must exist that the patient meets certain "requirements at the time of the patient's admission to the IRF" for the "IRF claim to be considered reasonable and necessary[,]" and thus reimbursable by Medicare.  *Id.* § 412.622(a)(3).  These requirements include:  (i) the patient must "require[ ] the active and ongoing therapeutic intervention of multiple therapy disciplines[;]" (ii) the patient must need "an intensive rehabilitation therapy program" that "generally consists of at least 3 hours of therapy . . . per day at least 5 days per week[;]" (iii) the patient must have a condition that "is sufficiently stable at the time of admission to the IRF to be able to actively participate in the intensive rehabilitation therapy program[;]" and (iv) the patient must "require[ ] physician supervision by a rehabilitation physician[.]"  *See* 42 C.F.R. § 412.622(a)(3)(i)–(iv); *see also* Centers for Medicare & Medicaid Servs., Medicare Benefit Policy Manual Ch. 1 § 110.02, https://tinyurl.com/yrw5vu8b (listing same four requirements from 42 C.F.R. § 412.622(a)(3) as the "Inpatient Rehabilitation Facility Medical Necessity Criteria" and

---

motion to dismiss because it's outside the pleadings.  *Id.*  Otherwise, relator argues, the court must convert the motion to one for summary judgment.  The court disagrees with relator's position.

On a Rule 12(b)(6) motion to dismiss, the court may take judicial notice of public records without converting the motion to one for summary judgment.  *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006) ("[F]acts subject to judicial notice may be considered in a Rule 12(b)(6) motion without converting the motion to dismiss into a motion for summary judgment.  This allows the court to take judicial notice of its own files and records, as well as facts which are a matter of public record.  However, the documents may only be considered to show their contents, not to prove the truth of matters asserted therein." (citations and internal quotation marks omitted)); *see also* Fed. R. Evid. 201 (allowing a court to "take judicial notice at any stage of the proceeding" of "a fact that is not subject to reasonable dispute"); *Clinton v. Sec. Benefit Life Ins.*, ___ F.4th ___, 2023 WL 2657306, at *6 (10th Cir. Mar. 28, 2023) ("Generally, a court considers only the contents of the complaint when ruling on a 12(b)(6) motion, but [an exception] to this general rule include[s] . . . matters of which a court may take judicial notice" (citations and internal quotation marks omitted)).  Here, the regulations issued by CMS are public records issued by a government agency that the court can consider on a motion to dismiss without converting the motion to one for summary judgment.

including a fifth requirement that the "patient must require an intensive and coordinated interdisciplinary approach to providing rehabilitation").

The governing regulations require IRFs to document a "comprehensive preadmission screening" that is "conducted by a licensed or certified clinician(s) . . . within the 48 hours immediately preceding the IRF admission."  42 C.F.R. § 412.622(a)(4).  This "comprehensive preadmission screening"—conducted before the patient's admission—must include an "initial determination" whether "the patient meets the requirements for an IRF admission to be considered reasonable and necessary in paragraph (a)(3)" of § 412.622.  *See id.* § 412.622(a)(4)(i)(C).  Also, "for an IRF claim to be considered reasonable and necessary[,]" patients must require "an interdisciplinary team approach to care," and the IRF must document it "in the patients' medical record" by documenting "weekly interdisciplinary team meetings" where the team implements appropriate treatment services, reviews the patient's progress, and identifies any impediments toward progress.  *Id.* § 412.622(a)(5).

After receiving an IRF's valid claim for reimbursement for "reasonable and necessary" treatment, Medicare reimburses the IRF for that treatment at a base payment rate, adjusted for various factors.  *See generally* 42 C.F.R. §§ 412.620, 624.  These factors include geographical differences in area wage levels, proportion of low-income patients at the IRF, whether IRF is located in a rural area, whether the IRF is a teaching hospital, and patient classifications to a case-mix group.  *Id.* § 412.624(c), (e).  The case-mix groups are "classes of Medicare patient discharges by functional-related groups that are based on a patient's impairment, age, comorbidities, functional capabilities, and other factors" that are assigned an "appropriate weight . . . that measures that relative difference in facility resource intensity among various case-mix groups."  *Id.* § 412.620(a)–(b).  The regulations also include "special payment provisions"

providing for adjustments to an IRF's payment when a patient is transferred or has one or more interruptions in the patient's stay.  *See* 42 C.F.R. § 412.624(e)–(f).

Here, relator bases his assertion that defendants submitted false or fraudulent claims to Medicare for medically unnecessary treatment on two things:  (1) his observation of two patients during the ten months or so he worked for defendant MidAmerica, and (2) FIM scores that didn't reflect accurately the patients' conditions.  Defendants argue that neither set of allegations supports a plausible FCA claim.  The court agrees, as it explains in the following two subsections.

### a.   Relator's Observations of Two Patients

Relator makes the conclusory assertion that he observed "a number of patients" for whom—relator believed—intensive rehabilitation therapy wasn't appropriate, either because the patient did not need it or because it wasn't reasonable to expect that the patient would benefit from it.  Doc. 34 at 8 (Second Am. Compl. ¶ 47).  He describes one patient, W.F., who was too unstable for rehabilitation and eventually was sent back to the hospital because of his unstable condition.  *Id.* (Second Am. Compl. ¶¶ 49–53).  Also, he describes a second patient, the Patient in Room 256, who was "violent and confused" and for whom "inpatient therapy otherwise reimbursable by Medicare was not appropriate" because of his condition.  *Id.* at 8–9 (Second Am. Compl. ¶¶ 54–58).  These thin and conclusory allegations fail to state a plausible FCA claim for submitting false or fraudulent claims to Medicare for medically unnecessary services for three separate and independent reasons.

*First*, relator fails to state a facially plausible claim based on submitting Medicare claims for medically unnecessary treatment.  In these two examples, relator describes his observations about two patients—after their admissions to the IRF—who relator didn't think were appropriate

patients for inpatient rehabilitation.  But relator never alleges any facts about these patients'

conditions at *admission*.  Also, relator doesn't allege any facts which could permit a reasonable

jury to find or infer fraud in the decision to admit them to the IRF or defendants' later

submission of a Medicare claim for these patients' treatment.

     The Second Amended Complaint never asserts that either W.F. or the Patient in Room

256 failed to meet any of the four requirements found in 42 C.F.R. § 412.622(a)(3) "at the time

of the patient's admission to the IRF" so that an IRF claim for these patients' treatment could not

"be considered reasonable and necessary[,]" and thus not properly reimbursable by Medicare.

*Id.* § 412.622(a)(3).  *Cf. Polukoff*, 895 F.3d at 743 (holding that "doctor's certification to the

government that a procedure is 'reasonable and necessary' is 'false' under the FCA if the

procedure was not reasonable and necessary under the government's definition of the phrase").

Relator alleges upon "information and belief" that a doctor from Truman Hospital contacted

defendant MidAmerica with concerns that W.F. was discharged to rehabilitation prematurely.

Doc. 34 at 8 (Second Am. Compl. ¶ 51).  Also, he alleges that he heard a doctor—at some

unknown time—express confusion why defendant MidAmerica had admitted Patient in Room

256 for rehabilitation therapy.  *Id.* at 9 (Second Am. Compl. ¶ 57).  These two physicians'

comments about these two patients' conditions—purportedly made sometime after their

admissions—plead no facts about the patients' conditions "at the time of the patient's admission

to the IRF[,]" whether the patients satisfied any of the "reasonable and necessary" requirements

of § 412.622(a)(3), anything about the physicians or clinicians who made the decisions to admit

these two patients, or any facts supporting a plausible inference of fraud in the decisions to admit

these two patients.  Instead, as defendants argue, relator seems to assert—but merely in

conclusory fashion—that he disagreed with the medical judgment of the admitting physicians for

these two patients.  Doc. 54 at 13–14.  But disagreement doesn't qualify as a false statement or fraudulent conduct—one of the elements that's required to state a plausible FCA claim.  *See Janssen*, 949 F.3d at 540 (explaining that "the FCA's focus 'remains on those who present or directly induce the submission of false or fraudulent claims' to the Government" (quoting *Escobar*, 579 U.S. at 182)); *see also U.S. ex rel. Morton v. A Plus Benefits, Inc.*, 139 F. App'x 980, 982 (10th Cir. 2005) (explaining that "[f]alsity under the FCA does not mean scientifically untrue; it means a lie" and "[a]t a minimum the FCA requires proof of an objective falsehood" (citations and internal quotation marks omitted)).

*Second*, relator fails to plead fraud with particularly as Rule 9(b) requires.  For a FCA plaintiff to comply with Rule 9(b), he must "provid[e] factual allegations regarding the who, what, when, where and how of the alleged claims."  *Polukoff*, 895 F.3d at 745 (citation and internal quotation marks omitted).  When determining whether Rule 9(b)'s pleading requirements are satisfied, "'courts may consider whether any pleading deficiencies resulted from the plaintiff's inability to obtain information in the defendant's exclusive control.'"  *Id.* (quoting *George v. Urban Settlement Servs.*, 833 F.3d 1242, 1255 (10th Cir. 2016)).  That's because "'Rule 9(b) does not require omniscience;'" but still, it "'requires that the circumstances of the fraud be pled with enough specificity to put defendants on notice as to the nature of the claim.'"  *Id.* (quoting *Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 803 (6th Cir. 2012)).  Here, the Second Amended Complaint is utterly lacking "who, what, when, were and how" allegations required to plead a viable FCA claim under Rule 9(b).  Relator never alleges *who* made the false or fraudulent statements when admitting these two patients to the IRF, *what* statements this person allegedly made about the two patients' conditions at their admission, *when* defendants made the false or fraudulent statements, *where* the false or fraudulent statements were

made, or *how* the false or fraudulent statements occurred.  Although the court recognizes that some of these facts may remain within "defendant's exclusive control[,]" relator still is required to plead facts with enough specificity to put defendants on notice of the FCA claims.  *See id.* (citation and internal quotation marks omitted).  *Cf. Clinton v. Sec. Benefit Life Ins.*, ___ F.4th ___, 2023 WL 2657306, at *9 (10th Cir. Mar. 28, 2023) (holding that complaint "sufficiently identifie[d] the 'what' and the 'how'—the content of [defendant's] Statements of Understanding and marketing materials and in what way they were allegedly fraudulent" to satisfy Rule 9(b) to support RICO claim).  Here, relator's conclusory allegations about his observations of two patients after their admission—without any facts about their condition at the time of admission or the purported fraudulent circumstances under which they were admitted—simply don't provide the requisite particularly demanded by Rule 9(b).

*Third*, relator's allegations about these two patients fail to allege facts capable of supporting a plausible finding or inference that defendants made false or fraudulent statements *material* to the government's decision to reimburse defendants for submitted Medicare claims. Although relator makes general allegations about materiality, he alleges no facts capable of supporting a reasonable finding or inference that defendants made any false statements or engaged in fraudulent conduct when making the pre-admission decision that a particular patient satisfied 42 C.F.R. § 412.622(a)(3)'s "requirements at the time of the patient's admission to the IRF" for an "IRF claim to be considered reasonable and necessary[.]"  *Id.* § 412.622(a)(3). Instead, relator relies on his personal observations of two patients to make broad assumptions that defendants made false statements or committed fraud when they admitted these two patients to the IRF and, in turn, submitted the claims to Medicare.  These assumptions don't suffice to state a plausible FCA claim based on defendants' alleged submission of fraudulent claims to

Medicare for services that weren't medically necessary. *See Twombly*, 550 U.S. at 557

(explaining that Rule 8(a) requires a plaintiff to plead facts showing "something beyond the mere

possibility" that defendants are liable for the misconduct alleged).

For these three separate and independent reasons, relator fails to state a plausible FCA

claim as a matter of law based on his observations of two patients at defendants' IRF.

### b.  FIM Scores

Relator also asserts that defendants submitted claims for medically unnecessary treatment

because—he contends—defendants provided treatment to a number of patients whose FIM

scores at admission didn't reflect the patients' conditions accurately. *Id.* at 8 (Second Am.

Compl. ¶ 46).  Relator's allegations about FIM scores fail to state a plausible FCA claim for

three reasons.

*First*, the Second Amended Complaint alleges no facts capable of supporting a

reasonable finding or inference that defendants made false or fraudulent claims based on FIM

scores.  Indeed, relator explicitly pleads that no one ever instructed him to falsify a particular

patient's FIM score. *Id.* at 7 (Second Am. Compl. ¶ 44).  Instead, he alleges that he "was

encouraged" to assign FIM scores to patients that did not reflect the patient's condition

accurately and was "regularly reminded" that he "needed to 'watch those FIM scores.'"  *Id.*

(Second Am. Compl. ¶¶ 43, 44).  He makes the conclusory assertion that "a Medicare

beneficiary's FIM score informed the beneficiary's need for and progress within inpatient

rehabilitation treatment, and therefore substantially affected whether the IRF's treatment of the

beneficiary was reasonable and necessary and therefore eligible for reimbursement." *Id.* at 6

(Second Am. Compl. ¶ 32).  But, he asserts no facts that can support this broad assertion.

Importantly, a patient's FIM score isn't one of the "reasonable and necessary" criteria for

determining whether to admit a patient to an IRF under 42 C.F.R. § 412.622(a)(3).  Also, relator alleges no facts describing unnecessary services that defendant provided based on inaccurate FIM scores, or how inaccurate FIM scores rendered defendants' services or claims for imbursement fraudulent.  Thus, relator fails to plead a facially plausible FCA claim based on inaccurate FIM scores.

*Second*, relator fails to plead—with particularity—a FCA claim based on inaccurate FIM scores as Rule 9(b) requires.  He makes a general and conclusory allegation that he "observed a number of patients whose FIM scores upon admission did not accurately reflect the patients' conditions."  Doc. 34 at 8 (Second Am. Compl. ¶ 46).  But he never provides "factual allegations regarding the who, what, when, where and how of the alleged claims."  *Polukoff*, 895 F.3d at 745 (citation and internal quotation marks omitted).  Indeed, relator never alleges any examples of a falsified FIM score for a particular patient.  The Second Amended Complaint never alleges *who* reported inaccurate FIM scores, *what* was inaccurate about the FIM scores, *when* the inaccurate FIM scores were made, *where* inaccurate FIM scores were made, *how* the FIM scores were false or fraudulent, or any other facts showing *how* the inaccurate FIM scores occurred.  Again, the court recognizes that some of these facts are within "defendant's exclusive control."  *Id.* (citation and internal quotation marks omitted).  But the governing legal standard still demands that relator plead facts with enough specificity to put defendants on notice of his FCA claims.  Here, relator's conclusory allegations about inaccurate FIM scores—allegations that don't even reveal whether the scores were too high or too low—don't satisfy Rule 9(b)'s particularly requirement.

*Third*, relator's allegations about the FIM scores never allege facts capable of supporting a plausible finding or inference that defendants made false or fraudulent statements that were *material* to the government's decision to reimburse defendants for submitted Medicare claims.

Again, the court notes that relator makes general allegations about materiality.  However, the Second Amended Complaint is free and clear of factual allegations capable of supporting a plausible finding or inference that defendants submitted false or fraudulent FIM scores to Medicare that were *material* to the government's decision to pay the Medicare claims.

While relator argues that "more than one court . . . has recognized the materiality" of "FIM score manipulation," Doc. 53 at 21, he cites cases where the relators asserted specific facts supporting a finding that defendants had submitted the alleged false FIM scores to the government and that the submissions were material to the government's decision to pay the defendants, *see U.S. ex rel. Luke v. Healthsouth Corp.*, No. 2:13-cv-01319-APG-VCF, 2018 WL 3186941, at *6 (D. Nev. June 28, 2018) (holding relator alleged materiality sufficient to survive a motion to dismiss where relator alleged "the fraudulently deflated Admit FIM score is put directly into the software that CMS uses to determine what services a facility like [defendants' IRF] is expected to provide to patients, and CMS bases the amount of prospective Medicare payments in part on the FIM[;]" thus relator had "plausibly alleged materiality because he has alleged manipulation of the criteria by which payment is determined"); *see also U.S. ex rel. Streck v. Bristol-Myers Squibb Co.*, No. 13-7547, 2018 WL 6300578, at *18 (E.D. Pa. Nov. 29, 2018) (holding that relator "satisfie[d] the materiality element" of his FCA claim where he alleged "manipulation of the criteria by which payment is determined" by CMS for rebates that drug manufacturer owed to the states because "[t]he dollar values of the rebates paid by each manufacturer to Medicaid are based on the [Average Manufacturer Price] of each distinct prescription drug reported by the manufacturer" and "misstatement of that data is material because it directly influences the final amount" that drug manufacturer "owed or received depend[ing] on data supplied by the defendant" (internal quotation marks omitted)).  The

decisive shortcoming of the Second Amended Complaint isn't its theory.  Relator's right.  Courts have recognized the legal theory of this claim.  Instead, relator's problem is that he has filed a pleading that's absent of the facts he alleges would give life to his theory.  Relator's Second Amended Complaint contains no factual allegations like those detailed in *Luke* or *Streck*.  In contrast, relator's FCA claims here fail to plead the materiality requirement because the Second Amended Complaint alleges no facts capable of supporting a reasonable finding or inference that defendants ever submitted false or fraudulent FIM scores to Medicare and that those submissions were material to the government's decision to reimburse defendants' Medicare claims.

For these three separate and independent reasons, relator fails to allege a plausible FCA claim based on defendants' alleged treatment of patients whose FIM scores didn't reflect accurately the patients' conditions.

### 3.  Relator's FCA Claims Based on Submitting Claims to Medicare for Inadequate Services Due to Understaffing

Next, the court addresses relator's FCA claims premised on alleged false or fraudulent claims submitted to Medicare for inadequate treatment to patients allegedly caused by defendants' understaffing of their IRF.  Relator cites no regulations or binding authority that governs IRF staffing ratios, although his Second Amended Complaint relies on proposed ratios found on a nursing union's website and a proposed bill never passed by Congress.  Doc. 34 at 6 (Second Am. Compl. ¶ 34) (first citing National Nurses United, https://www.nationalnursesunited.org/ratios (last visited Mar. 29, 2023); then citing Nursing Staffing Standards for Hospital Patient Safety and Quality Care Act of 2019, H.R. 2581, 116th Cong. § 2 (May 8, 2019)).  Defendants respond that "there are no IRF regulations that mandate (or reference) any specific staffing ratio."  Doc. 43 at 26.  Instead, defendants assert, relator's allegations merely "quibble[ ]" with defendants' staffing ratios and never assert facts from which

a reasonable jury could find or infer that defendants submitted any false claims resulting from inadequate staffing, or that the false claims were material to the government's decision to pay Medicare claims. *Id.* The court agrees with defendants' points.

Like relator's other FCA claims, his understaffing allegations fail to allege fraud with particularly as Rule 9(b) requires. *See Polukoff*, 895 F.3d at 745 (explaining that, to comply with Rule 9(b), a FCA claim must "provid[e] factual allegations regarding the who, what, when, where and how of the alleged claims" (citation and internal quotation marks omitted)). The Second Amended Complaint alleges no facts specifically showing *who* provided inadequate services, *what* inadequate services resulted from defendants' staffing ratios, *what* claims defendants submitted based on inadequate services, *when* defendants submitted the claims for inadequate services, *where* defendants allegedly provided inadequate services, and *how* defendants' staffing ratios were inadequate or failed to comply with IRF regulations. Although relator makes a general and conclusory assertion that he "witnessed substandard care for his patients . . . directly caused by [d]efendant MidAmerica's understaffing policies" and provides four examples of patients "whose records reflected that a number of crucial services that had been scheduled for the previous shift had not been completed[,]" Doc. 34 at 10–11 (Second Am. Compl. ¶¶ 73, 75, 77–79), relator never alleges that the "crucial services" never were completed, or that the delay of the "crucial services" somehow caused defendants' patients to receive inadequate care. And, importantly, relator never alleges facts capable of supporting a reasonable finding or inference that defendants' staffing ratios resulted in defendants submitting false or fraudulent claims to Medicare for treatment that wasn't medically necessary.

Relator's Opposition explains that he premises his inadequate staffing claims on a "'worthless services' theory of liability under the FCA." Doc. 53 at 17. He cites federal district

court cases within the Tenth Circuit recognizing that a "worthless services" claim under the FCA "is based on 'the knowing request for federal reimbursement for a procedure with no medical value.'" *United States v. Dental Dreams, LLC*, No. 13-1141-JH/KBM, 2016 WL 9777254, at *9 (D.N.M. Sept. 26, 2016) (quoting *Mikes v. Straus*, 274 F.3d 687, 702 (2d Cir. 2001)).[5]

To allege a plausible FCA claim based on a "worthless services" theory, relator "must show that the defendant knew the procedure billed had no medical value; negligence is insufficient." *Id.* (citing *Mikes*, 274 F.3d at 703); *see also U.S. ex rel. New Mexico v. Deming Hosp. Corp.*, 992 F. Supp. 2d 1137, 1160, 1162 (D.N.M. 2013) (recognizing that the "Second, Sixth, and Ninth Circuits have adopted" a worthless services "theory of FCA liability" but holding that relator failed to allege a worthless services claim under the FCA when she hadn't "adequately alleged that the services provided were 'entirely devoid of value' or that [d]efendants 'utterly failed' to provide any services to their patients such that the laboratory's tests were 'the equivalent of no performance at all'"); *U.S. ex rel. Sanchez-Smith v. AHS Tulsa Reg'l Med. Ctr.*, 754 F. Supp. 2d 1270, 1287 (N.D. Okla. 2010) (explaining that "'worthless services' FCA theory of liability is 'effectively derivative of an allegation that a claim is factually false because it seeks reimbursement for a service not provided' and that, in a worthless services FCA case, a plaintiff argues that 'the performance of the service is so deficient that for all practical purposes it is the equivalent of *no performance at all*'" but holding relators alleged no FCA claim based on worthless services theory because they "failed to demonstrate the provision of worthless services or anything amounting to gross negligence with respect to the active treatment regulations at issue" (quoting *Mikes*, 274 F.3d at 703)).

---

[5] The New Mexico federal district court recognized that the Second Circuit's decision in *Mikes v. Straus* was abrogated on other grounds by *Universal Health Services, Inc. v. United States ex rel. Escobar*, 579 U.S. 176 (2016).

Relator concedes that his allegations don't "satisfy" the "stringent standard" for pleading a worthless services claim applied by federal district courts in our Circuit.  Doc. 53 at 18.  But relator urges the court to apply a less stringent standard articulated by two federal district courts outside of the Tenth Circuit.  *See id.*  The court declines.  Although the Tenth Circuit hasn't yet decided whether a relator may bring a worthless services claim under the FCA, at least three federal district courts in our Circuit, relying on authority from the Second, Sixth, and Ninth Circuit, have recognized such a claim.  If confronted with this issue, the court predicts the Tenth Circuit would find persuasive the reasoning of these other Circuit Courts of Appeals and the federal district courts in our Circuit.  And the court predicts the Tenth Circuit would require a worthless services claim to allege that defendant knowingly billed services to the government that had no medical value.  *See, e.g.*, *Dental Dreams*, 2016 WL 9777254, at *9.  Here, relator fails to plead facts capable of supporting a finding or inference that defendants' staffing ratios resulted in defendants knowingly submitting claims to Medicare for medical services that had no medical value.  Thus, relator fails to state a plausible worthless services claim.

In sum, the court holds that relator fails to plead a plausible FCA claim based on defendants' alleged inadequate staffing ratios.

### 4.  Conclusion

The court concludes that the Second Amended Complaint's allegations—taken as true and viewed in relator's favor—simply fail to plead facts capable of supporting a plausible FCA claim.  To survive a Rule 12(b)(6) motion, relator must allege facts capable of supporting "something beyond the mere possibility" that defendants violated the FCA.  *Twombly*, 550 U.S. at 557 (citation and internal quotation marks omitted).  The pleading stage requires relator to set forth "allegations plausibly suggesting" that defendants submitted false or fraudulent claims to

the government for reimbursement under Medicare.  *Id.*  Here, the Second Amended Complaint falls short of that standard because it makes only conclusory assertions without the requisite factual detail to support a FCA claim.  In sum, relator's allegations here simply don't "nudge[ ]" his FCA claims "across the line from conceivable to plausible."  *Id.* at 570.  Thus, the court dismisses these claims under Rule 12(b)(6) because they fail to state a plausible claim for relief.

### B.  FCA Retaliation Claim (Count III)

Next, defendants argue that relator fails to allege a plausible retaliation claim under the FCA.  The FCA includes a provision that "protects whistleblowers from retaliation by their employers."  *U.S. ex rel. Reed v. KeyPoint Gov't Sols.*, 923 F.3d 729, 764 (10th Cir. 2019) (citing *Potts v. Ctr. for Excellence in Higher Educ., Inc.*, 908 F.3d 610, 613–14 (10th Cir. 2018) (discussing 31 U.S.C. § 3730(h))).  A FCA retaliation claim has three elements:  relator must allege "(1) [he] engaged in protected activity, (2) the defendant had been put on notice of that protected activity, and (3) the defendant retaliated against [relator] because of that activity."  *Id.* (citations and internal quotation marks omitted).

Defendants assert that relator's FCA retaliation claim fails to state a plausible claim for two reasons.  Defendants argue that relator never alleges facts sufficient to support a reasonable finding or inference of the first or third elements of a FCA retaliation claim.  That is, defendants contend that relator fails to plead that he engaged in a protected activity or that a causal connection exists between any alleged protected activity and relator's termination of employment.  The court agrees.  As discussed, below, relator's FCA retaliation claim fails for these two separate and independent reasons.

### 1.   Protected Activity

Defendants argue that none of relator's allegations plausibly assert that he has engaged in protected activity sufficient to support a FCA retaliation claim.

The FCA includes "whistleblower protections to protect employees who take 'lawful' actions 'in furtherance of other efforts to stop 1 or more violations' of the False Claims Act." *KeyPoint Gov't Sols.*, 923 F.3d at 765 (quoting 31 U.S.C. § 3730(h)(1)) (emphasis omitted). FCA "whistleblowers who lawfully try to stop one or more violations of the Act are protected, without regard to whether their conduct advances a private or government lawsuit under the Act." *Id.*

Here, relator alleges that he filed "an incident report" about the inappropriate admission of W.F.  Doc. 34 at 8 (Second Am. Compl. ¶ 53).  Relator never alleges what he reported in the incident report or any facts that could support a plausible inference that he complained defendants were submitting false or fraudulent claims to the government, and thus violating the FCA.  Defendants argue that relator's complaints about W.F. merely expressed his personal opinions and disagreement about W.F.'s medical care, but not a complaint about false claims submitted to Medicare.  Allegations like relator's don't suffice to assert "something beyond the mere possibility" that relator's incident report qualified as FCA protected activity.  *Twombly*, 550 U.S. at 557 (citation and internal quotation marks omitted); *see also McBride v. Peak Wellness Ctr., Inc.*, 688 F.3d 698, 704 (10th Cir. 2012), *superseded by statute on other grounds at stated in KeyPoint Gov't Sols.*, 923 F.3d at 765 (holding that plaintiff's "statements about 'how terrible [defendant] is' and lack of compliance with [defendant's] internal policies does not amount to an accusation of illegal, let alone fraudulent, conduct" and thus she hadn't engaged in protected activity sufficient to support FCA retaliation claim).

Also, relator alleges that he complained to defendant Kiehl about staffing ratios by

sending three separate emails on April 9, 2019, July 12, 2019, and August 13, 2019.  Doc. 34 at

11–12 (Second Am. Compl. ¶¶ 84–85).  Again, the Second Amended Complaint alleges no facts

supporting a plausible finding or inference that relator's complaints alleged or otherwise

constituted an effort to stop a FCA violation.  Relator never alleges that his complaints about

staffing ratios included complaints that defendants were submitting false or fraudulent claims to

Medicare.  Instead, as defendants argue, the Second Amended Complaint alleges complaints

about staffing ratios that "were merely [his] personal opinion about, and disagreement with,

management's staffing decisions" but "have nothing at all to do with fraud or false claims, or

stopping FCA violations."  Doc. 54 at 21.  Relator is entitled to his opinion about staffing

decisions but a disagreement about them—without more—doesn't qualify as "protected

activity."  These allegations simply don't assert facts supporting a reasonable finding or

inference that relator engaged in protected activity sufficient to allege a viable FCA retaliation

claim.

## 2.   Causal Connection

Relator's FCA retaliation claim fails for a second and independent reason.  Relator fails

to allege facts supporting a plausible inference of a causal connection between relator's

complaints and defendants' termination of relator's employment.  Relator argues that defendants

"would have understood [his] presentation of those concerns" about staffing ratios, patient

safety, and inappropriate admission of patients "as concerns about [d]efendants['] billing

practices."  Doc. 53 at 23.  Although the court must view relator's allegations in his favor on a

motion to dismiss, relator's argument stretches the governing legal standard too far.  The Second

Amended Complaint never alleges that relator complained about billing practices or that his

complaints otherwise referenced false or fraudulent claims to Medicare.  In short, he doesn't allege any basis for a reasonable jury to find a plausible causal connection between his complaints and his termination sufficient to support a FCA retaliation claim.

Also, relator alleges that the timing of his complaints gives rise to a reasonable inference of causation.  As our Circuit has explained, "courts may infer a causal connection" sufficient to support a FCA retaliation claim "where 'protected conduct is closely followed by the adverse action.'"  *Miller v. Inst. for Def. Analyses*, 795 F. App'x 590, 596 (10th Cir. 2019) (quoting *Ward v. Jewell*, 772 F.3d 1199, 1203 (10th Cir. 2014)).  Our Circuit has "'held that a one and one-half month period between a protected activity and adverse action may, by itself, establish causation[, but] a three-month period, standing alone, is insufficient to establish causation.'"  *Id.* (first quoting *Foster v. Mountain Coal Co.*, 830 F.3d 1178, 1191 (10th Cir. 2016); then citing *Hennagir v. Utah Dep't of Corr.*, 587 F.3d 1255, 1266 (10th Cir. 2009)).

Here, relator made his staffing complaints on April 9, 2019, July 12, 2019, and August 13, 2019.  Doc. 34 at 11–12 (Second Am. Compl. ¶¶ 84–85).  And, relator alleges, defendant MidAmerica terminated his employment on October 14, 2019.  *Id.* at 12 (Second Am. Compl. ¶ 86).  Thus, relator's termination occurred more than two months after his last complaint about staffing ratios.  This temporal proximity, on its own, doesn't suffice to support an inference of causation.  *See Gatti v. Granger Med. Clinic, P.C.*, 529 F. Supp. 3d 1242, 1256–57 (D. Utah 2021) (holding that temporal proximity of two months between making threats to file a *qui tam* lawsuit and termination was "insufficient, on its own, to permit an inference of causation").  *Cf. Lipka v. Advantage Health Grp., Inc.*, No. 13-CV-2223, 2013 WL 5304013, at *6 (D. Kan. Sept. 20, 2013) (holding that termination occurring "just 4 days after notifying" defendants about

alleged FCA violation was "sufficient to create a reasonable inference that a causal connection exists between plaintiff's alleged protected activity and the termination decision").

Relator's Second Amended Complaint never alleges when he submitted his "incident report" about patient W.F.  However, other parts of the Second Amended Complaint allege that he cared for W.F. "around September 5, 2019[.]"  Doc. 34 at 8 (Second Am. Compl. ¶ 49). Thus, it's reasonable to infer that relator submitted the incident report sometime around September 5, 2019.  Although the timing of a September incident report might establish the temporal proximity required to establish a causal connection to the October 14 termination because it occurred about five weeks after the purported complaint, the Second Amended Complaint alleges nothing about the contents of the incident report to support a reasonable finding or inference that defendants terminated relator's employment *because* he was complaining about or trying to stop a FCA violation.  As discussed, the Second Amended Complaint alleges no facts supporting a plausible inference that the incident report alleged anything about fraudulent billing, false claims to the government, or anything else suggesting that relator was complaining about or trying to stop FCA violations.

For all these reasons, relator fails to state a plausible FCA retaliation claim as a matter of law.

### C.  § 1981 Race Discrimination Claim (Count IV)

Defendants next assert that relator's Second Amended Complaint fails to allege a plausible race discrimination claim under § 1981.  The legal standards governing § 1981 claims are the same as those for Title VII.  *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) (citations omitted).  To plead a prima facie case of race discrimination, relator must allege that (1) he "belongs to a protected class;" (2) he "suffered an adverse employment action;"

and (3) "the challenged action took place under circumstances giving rise to an inference of discrimination." *See EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007).

Section 1981 requires a plaintiff to allege that "race was a but-for cause of [his] injury." *Comcast Corp. v. Nat'l Assoc. of African American-Owned Media*, 140 S. Ct. 1009, 1014 (2020); *see also id.* at 1019 ("To prevail [on a § 1981 claim], a plaintiff must initially plead and ultimately prove that, but for race, [he] would not have suffered the loss of a legally protected right."); *Mann v. XPO Logistics Freight, Inc.*, 819 F. App'x 585, 594 n.15 (10th Cir. 2020) (explaining that *Comcast* requires a plaintiff to "establish that race was a but-for cause of injury (as opposed to a 'motivating factor') to prevail on a § 1981 claim" (citing *Comcast Corp.*, 140 S. Ct. at 1014)).

Here, defendants argue, relator fails to plead that race discrimination was the but-for cause of his termination. Instead, relator merely asserts that his race "was at least a motivating factor for the adverse employment action[.]" Doc. 34 at 17 (Second Am. Compl. ¶ 122). Relator's Opposition "concedes that his pleading with regard to his race discrimination claim likely fails to satisfy even the liberal pleading standard of Fed. R. Civ. P. 8(a)." Doc. 53 at 24. But he asks the court for leave to amend to cure his pleading deficiency. *Id.* The court addresses relator's request for leave to amend in the next subsection. But, based on defendants' argument and relator's concession, the court concludes that the Second Amended Complaint fails to allege a plausible claim for race discrimination under § 1981.

### D.  Relator's Request For Leave to Amend under Rule 15

Relator's Opposition "disputes that his Second Amended Complaint is so factually lacking to survive a motion to dismiss" and argues that he "has adequately plead allegations to support claims of fraud pursuant to the False Claims Act and claims of wrongful termination"

under the FCA and § 1981.  Doc. 53 at 26.  But, relator moves, "in the event the [c]ourt agrees with [d]efendants" that his Second Amended Complaint fails to state a claim, "for the opportunity to further amend in conformity with those deficiencies identified by the [c]ourt."  *Id.*

The court recognizes that Fed. R. Civ. P. 15(a)(2) directs courts to "freely give leave [to amend] when justice so requires."  Fed. R. Civ. P. 15(a)(2).  And, refusing to grant leave to amend "is generally only justified upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment."  *Frank v. U.S. W., Inc.*, 3 F.3d 1357, 1365 (10th Cir. 1993).  Here, defendants argue that leave to amend is futile.  Doc. 54 at 25.  To support their futility argument, defendants argue that relator hasn't come forward with facts to include in an amended complaint that would plead viable claims.  Also, relator never has submitted a proposed amended complaint containing factual allegations necessary to support plausible claims.  Instead, his Opposition stands on his claims as alleged—arguing that he has stated viable claims.  But then, he qualifies the argument with a request for leave to amend "in the event" the court finds relator fails to allege a claim and only "for the opportunity to further amend in conformity with those deficiencies" the court identifies.  Doc. 53 at 26.  These arguments don't persuade the court that leave to amend is warranted here.  Instead, the court concludes that relator's request for leave to amend is futile because he provides no explanation how he intends to or could cure his pleading deficiencies.

Also, our court's local rules require a party who seeks leave to amend a pleading to file a separate motion seeking leave and that "(1) set[s] forth a concise statement of the amendment or leave sought; (2) attach[es] the proposed pleading or other document; and (3) compl[ies] with the

other requirements of D. Kan. Rules 7.1 through 7.6." D. Kan. Rule 15.1(a) (Dec. 1, 2009).[6]

Relator didn't do that. He recognizes that the local rule requires a movant seeking leave to attach

a proposed amended pleading but he asserts that the rule shouldn't apply here because he "only

requests leave to amend in the event the [c]ourt finds his Second Amended Complaint deficient"

and thus "it is impracticable for [r]elator at this time to anticipate where his opinion and the

[c]ourt's diverge." Doc. 53 at 26 n.9. That's not correct. Defendants plainly put relator on

notice of his pleading deficiencies when they filed their Motion to Dismiss. Relator never has

sought leave to amend his pleading to allege the additional facts that defendants' motion had

identified as lacking. And he never explains what those facts are that will make his claims

viable. Because relator neither submitted a proposed pleading for the court's review with

additional facts to support his FCA or § 1981 retaliation claims, nor has he provided additional

facts that an amended pleading would include to cure the deficiencies in pleading these claims,

the court finds that granting relator leave to amend here is futile.

Relator's Reply argues that he's unable to identify additional facts to support his claims

because he hasn't "had full opportunity to investigate his claims" while the government was

making its decision whether to intervene in this case. Doc. 55 at 3. Perhaps some facts

necessary to support relator's FCA claims lie within defendants' exclusive control and require

investigation. However, this argument ignores that relator should have personal knowledge of

other facts that could support his FCA and § 1981 claims, but he's neither pleaded them nor

offered them as proposed amendments to his pleading. Just to name a few, such facts would

---

[6]   The court cites the 2009 version of the court's local rule because that was the effective rule when
the parties submitted their briefs on the pending motion. On December 1, 2022, the District of Kansas
amended this local rule. The new rule contains the same three requirements of the 2009 version but
includes a new, fourth requirement. It requires the party seeking leave to amend "must also attach a
redlined version of the proposed amendment that shows all purposed changes to the pleading[.]" D. Kan.
Rule 15.1(a) (Dec. 1, 2022).

include:  facts connecting defendants' alleged admission of patients who didn't require rehabilitation services and their alleged understaffing to false or fraudulent statements submitted to Medicare; the actual contents of relator's complaints about patient W.F. and staffing ratios that would permit a plausible inference that his complaints were alleging or trying to stop FCA violations; the reason(s) defendants gave him for his termination; and the identification of other employees who are white and never complained about staffing ratios but engaged in the same or similar conduct for which relator was terminated (whatever that was) but were not fired from their employment.  Because relator hasn't offered such facts or submitted a proposed amended complaint showing the facts that could cure his pleading deficiencies, the court denies his request for leave to amend.[7]  *See Calderon v. Kan. Dep't of Soc. & Rehab. Servs.*, 181 F.3d 1180, 1187 (10th Cir. 1999) (holding that district court didn't abuse its discretion by failing to address plaintiff's request for leave to amend when plaintiff made the request in a "single sentence, lacking a statement for the grounds for amendment and dangling at the end of her memorandum" because it didn't give "adequate notice to the court[ ] and the opposing party" of the basis for the proposed amendment); *see also Johnson v. CMC Prop. Leasing, Inc.*, No. 12-1309-SAC, 2012 WL 6025601, at *7 (D. Kan. Dec. 4, 2012) (denying request for leave to amend because

---

[7]      Relator asks the court to grant him leave to file an amended complaint as this court previously did in another FCA case.  *See U.S. ex rel. Schroeder v. Medtronic, Inc.*, No. 17-2060-DDC-KGG, 2021 WL 4168140, at *20–21 (D. Kan. Sept. 14, 2021).  *Schroeder* differs from this case in at least two important respects.  *First*, the relator in *Schroeder* had alleged several plausible FCA claims based on certain alleged illegal kickbacks.  Thus, the case was proceeding on those claims, and the court offered relator the opportunity to amend his deficient FCA claims based on other alleged conduct.  In contrast here—none of relator's claims—either under the FCA or § 1981—state a plausible claim.  *Second*, the relator in *Schroeder* had failed to plead the FCA claims with particularity, but the court recognized that relator could cure those deficiencies with additional facts in an amended pleading.  Here, the court has found relator has failed to plead his FCA claims with particularity but also that his claims lack facial plausibility and fail to allege materiality.  Relator hasn't identified any facts he would assert to cure these multiple pleading deficiencies in a Third Amended Complaint.  Thus, neither the facts nor procedural posture here resemble those presented in *Schroeder*.  And the court's previous grant of leave in *Schroeder* doesn't persuade the court that it should grant leave to relator here.

plaintiffs made only "a bare request in their response to a motion to dismiss asking for leave but offer[ed] no particular grounds for the request as to even constitute an application for leave" and the request didn't "meet the requirements of D. Kan. Rule 15.1," nor provide "sufficient notice on which to base a ruling" granting leave to file an amended pleading (citation and internal quotation marks omitted)).

## IV.    Conclusion

For reasons explained, the court grants defendants' Motion to Dismiss Relator's Second Amended Complaint (Doc. 42) because the pleading fails to allege plausible claims under the FCA or § 1981. Also, the court denies relator's Motion for Leave to File Third Amended Complaint (Doc. 53) because he fails to explain—either through his motion or a proposed amended pleading—that additional facts or detail will cure the deficiencies of his FCA and § 1981 claims.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' Motion to Dismiss Relator's Second Amended Complaint (Doc. 42) is granted.

**IT IS FURTHER ORDERED THAT** relator Josiah Chumba's Motion for Leave to File Third Amended Complaint (Doc. 53) is denied.

**IT IS SO ORDERED.**

**Dated this 31st day of March, 2023, at Kansas City, Kansas.**

s/ Daniel D. Crabtree
**Daniel D. Crabtree**
**United States District Judge**